UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DEMARCUS MONDRE BROWN, ) | |
| as Administrator of the Estate of ) | |
| Philemon Coleman, Deceased ) | |
| ) | |
| Plaintiff, ) | Case Number: 2:13-cv-00417-JHE |
| ) | |
| v. ) | |
| ) | |
| WARDEN CHERYL PRICE, et al., ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM OPINION[1]

Plaintiff Demarcus Mondre Brown brings this action as administrator of the Estate of Philemon Coleman against Defendants Warden Cheryl Price, Alabama Department of Corrections Commissioner Kim T. Thomas, Lieutenant Joel A. Gilbert, Captain Carl Sanders, and Correctional Officers Mark Lavine and Aaron Lewis, asserting Eighth Amendment constitutional claims under 28 U.S.C. § 1983 and Wrongful Death claims under Ala. Code § 6-5-410.  (Doc. 25).[2]  The remaining defendants move for partial summary judgment as to Brown's § 1983 claims.  (Doc. 39).[3]  The motion is fully briefed and ripe for review.  (Docs. 40 & 42).  For

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 10).

[2] Brown initially asserted claims against Corizon, LLC, (docs. 1 & 25), which were dismissed with prejudice pursuant to an unopposed motion for summary judgment, (docs. 33-38).  This appears to include all of Counts III and IV.  Although it is somewhat unclear whether Brown's reference to "Defendants" under Count III is an attempt to include the other defendants in that claim as well, (*see* doc. 25 at ¶ 33), any allegations against the remaining defendants under Count III (a state claim for wrongful death by medical malpractice) would be due to be **REMANDED** with the other wrongful death claims.  *See* Section III.B., *infra*.

[3] Defendants' motion for summary judgment requests dismissal of "all claims asserted and applicable to the ADOC Defendants in the amended complaint."  (Doc. 39 at 2).  However,

1

the reasons stated below, Defendants' motion is **GRANTED**.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-

---

Defendants never mention the wrongful death claim in their motion brief, focusing only on the deliberate-indifference analysis. (*See* doc. 40). To the extent the wrongful death count is based on negligence, the Court declines to fill Defendants' silence with arguments for summary judgment on that claim. *See Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) ("[T]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . ."); *Coquina Investments v. Rothstein*, No. 10-60786-CIV, 2011 WL 4971923, at *16 (S.D. Fla. Oct. 19, 2011) (declining to dismiss state-law claims—even ones similar to other dismissed claims—in the absence of argument on those specific issues); *Hartwell v. City of Montgomery, AL*, 487 F. Supp. 2d 1313, 1328 (M.D. Ala. 2007) (declining to address issues defendant had not briefed in the motion for summary judgment).

moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Factual Background

At the time of his death on February 6, 2012, Coleman was serving a life sentence without the possibility of parole for murder at Donaldson Correctional Facility. (Doc. 34-1 at 3).[4] Coleman was incarcerated in the segregation unit from December 29, 2009, until his death. (Doc. 49-3 at 51). The evidence indicates Coleman was offered all of the medications and routine tests he required for his hypertension and diabetes while in segregation. (Doc. 49-3 at 50-55). After Coleman's death, the Jefferson County Coroner's Medical Examiner Office performed an autopsy on the body and concluded he died a natural death from atherosclerotic coronary artery disease with contributing hypertensive cardiovascular disease. (Doc. 34-2 at 2).

On the night of Coleman's death, Defendant Gilbert was the shift supervisor, (doc. 49-2 at 5 (19)); non-party E. Mitchell was the cubical officer, (*id.* at 10 (17)); and Defendants Lavine and Lewis were assigned to the segregation unit as "rovers," (*id.* at 45-46). According to the

---

[4] Defendants adopted by reference former Defendant Corizon's brief and attachments supporting its motion for summary judgment, (doc. 34). (Doc. 40 at 2).

duty post log, Lewis and Lavine conducted safety and security checks throughout the evening of February 5, 2012, with each resulting in an "all secure." (Doc. 49-2 at 46-47). At 9:05 p.m., Lavine left the disciplinary segregation unit (I and J) for units P and Q, his primary assignment. (Doc. 49-2 at 8 (30) & 47). At 10:00 p.m., Lewis was reassigned to units A and B due to a shortage of staff.[5] (Doc. 49-2 at 8 (30) & 47). At 11:15 p.m., Lavine returns to I and J to conduct a "bed roster," resulting in all "16 [inmates] accounted for." (Doc. 49-2 at 8 (29) & 47). Between 12:05 a.m. and 2:15 a.m. on February 6, 2012, the duty post log records no safety and security checks or any other events. (*Id.* at 47). At 2:15 a.m., Lewis returned from A and B to begin distributing food trays. (*Id.*). Around 2:30 a.m., Lewis discovered Coleman unresponsive in his cell and called for assistance. (*Id.* at 48). Sanders arrived and called for a stretcher. (*Id.*). He also called Lieutenant Gilbert, who arrived shortly thereafter. (*Id.* at 15 (59) & 48). Nurses Wix and Smith arrived to assist Coleman, (doc. 49-2 at 48), unsuccessfully attempting defibrillation, (*Id.* at 15 (59)). Gilbert and the nurses then began CPR. (*Id.* at 15 (59-60)). Coleman was pronounced dead at 3:08 am. (Doc. 34-2 at 2).

Brown asserts there was an attempted cover up of the events of that night. (Doc. 42 at 2). After Coleman's death, Gilbert told Lavine "to make sure that the schedules that were being kept . . . reflected that he made rounds which he did not make" on the night Coleman died. (Doc. 49-2 at 4 (13)). Gilbert testifies later in the same deposition he had not asked Lavine "to write down in [the duty post] log that he had done checks in the particular unit I and J" but that he had told Lavine "the logs better reflect that he made his rounds." (*Id.* at 8 (31-32)). It is unclear what exactly Gilbert is testifying he did, but, in any event, he was disciplined for conduct "unbecoming of an officer either on or off duty." (*Id.* at 4 (13)). Under the Rule 56 standard, the

---

[5] Gilbert testified that, when there was a shortage of staff at the prison, officers would be reassigned to security posts where inmates were out of their cells. (Doc. 49-2 at 17 (67-68)).

4

Court construes Gilbert's ambiguous testimony in favor of the plaintiff, as evidence of an attempt to cover up the undisputed fact of Lavine's failure to do all of his rounds.[6]

### III. Analysis

**A. Count I – § 1983**

Count I of Brown's amended complaint asserts a § 1983 claim based on alleged violations of Coleman's Eighth Amendment rights, made applicable to the states through the Fourteenth Amendment. (Doc. 25 at 6-7).

Title 42 U.S.C. § 1983 authorizes private parties to enforce federal constitutional rights (and some federal statutory rights) against defendants who act under color of state law. Section 1983 states as follows:

> **Every person** who, **under color of** any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia [i.e., **law**], **subjects, or causes to be subjected, any citizen** of the United States or other person within the jurisdiction thereof **to the deprivation of any rights, privileges, or immunities** secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

---

[6] Defendants do not mention this fact one way or the other in their summary judgment brief, (*see* doc. 40 at 2-3), but Brown asserts it in his response, (doc. 42 at 9-10), with consistent evidence, (doc. 49-2 at 4 (15), 9 (35), & 47).

Brown also cites a recorded statement from Lavine, taken by an investigator shortly after Coleman died, in which Lavine states he checked on Coleman at 1:45 a.m. (Doc. 42 at 6-7) (citing doc. 46-1 at 65-68). (The statement is only in the record as transcribed into the transcript of Price's deposition, at which Brown's attorney played the recording.) Brown interprets the recorded statement as evidence of another log not produced by the defendants and notes the duty log produced and currently in evidence does not show anyone in the I & J units to perform the security checks. (Doc. 42 at 13). It is unclear what purpose Brown intends this evidence to serve, but, attempting to take the evidence in the light most favorable to Brown, the undersigned assumes Lavine did not check on Coleman at 1:45 a.m.

42 U.S.C. § 1983 (emphasis added).  Notably, § 1983 does not itself create or establish any federally protected right.  *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1265 (11th Cir. 2010).  Instead, it creates a cause of action for a plaintiff to enforce federal rights created elsewhere, such as constitutional rights.  *Id.*  To assert a cause of action based on § 1983, a plaintiff must establish two elements: (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of law.  *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005).  Section 1983 does not abrogate a state's Eleventh Amendment immunity, and "neither a State nor its officials acting in their official capacities are 'persons' under §1983."  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989).  Furthermore, a defendant cannot be held liable under § 1983 on a *respondeat superior* theory but must be shown to have had personal involvement in the constitutional violation or another sufficiently causal connection exists between their own conduct and the violation.  *Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992) (citing *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 691 (1978)).  Lastly, under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

Brown alleges "[t]he defendants were indifferent to the medical needs of [Coleman] and allowed him to be in segregation in violation of their Administrative Procedures where he died" and, if not for Defendants' actions, "Coleman would still be alive because he could have been treated."  (Doc. 42 at 1-2).  Brown asserts Corizon had advised ADOC of Coleman's serious medical condition and "a lay person can see the need of monitoring Mr. Coleman and him being

in a [sic] area where he can notify correctional personnel of a medical need." (*Id.* at 2). Brown argues "[t]he defendants acted with a deliberate and intentional conduct by not providing monitoring to [Coleman]" in violation of their own policies. (*Id.*)

### 1. Official Capacity Claims and Commissioner Thomas

In his complaint, Brown concludes each of the descriptions of the parties with a statement of whether he is suing them in their individual or "professional" (i.e., official) capacity. (Doc. 25 at 3-5). Brown asserts his claims against all of the defendants in their official capacities and against all but Thomas in their individual capacities. (*Id.*). However, as stated above, "neither a State nor its officials acting in their official capacities are 'persons' under §1983." *Will*, 491 U.S. at 71. As the Alabama Department of Corrections is a state agency and any suit against its agents in their official capacities is a suit against the state, the motion for summary judgment is due to be **GRANTED** on Brown's § 1983 claims against all defendants in their official capacities. This dismisses the only § 1983 claim against Commissioner Kim Thomas.[7]

### 2. Captain Sanders

Although Sanders is listed in the amended complaint's caption as a defendant, he is not included in the list of defendants in the body and his participation in the alleged wrongful conduct is not defined further in the complaint. (*See* doc. 25). In fact, the only other mention of him is in the request for relief paragraph seeking judgment against all of the defendants. (*Id.*). Despite the fact Defendants' motion for summary judgment points this out, (doc. 40 at 2),

---

[7] Moreover, the only specific facts Brown alleges regarding Thomas is that he "is responsible for the actions of the employees under him working in the Alabama Department of Corrections." (Doc. 42 at 3). There is no evidence that Thomas was in any way connected to the events at Donaldson on the night Coleman died or that he implemented or condoned any policy leading to Coleman's death. In addition to the fact a § 1983 claim cannot be brought against a state official in his official capacity, the motion for summary judgment would be due to be granted as to Thomas because a § 1983 claim cannot be premised on a *respondeat superior* theory. *See Dean*, 951 F.2d at 1215.

Brown's response does not address Sanders's specific conduct either, (*see* doc. 42). The evidence indicates he was present after Coleman was discovered unresponsive and he called the nurses and Lieutenant Gilbert. (Doc. 49-2 at 15 (59) & 48). Because there are no specific allegations or evidence against Sanders indicating his conduct was in any way related to Coleman's death or the alleged constitutional violations leading to it, the motion for summary judgment is due to be **GRANTED** on all claims against Sanders.

### 3. Lieutenant Gilbert and Officers Lavine and Lewis

Brown specifically alleges Gilbert "allowed and directed Defendant[s] . . . Lavine and Lewis to act outside of their administrative rules and procedures and left their post for long periods of time only to return and discover [Coleman] dead in a locked cell without anyone checking on him or providing him medical treatment." (Doc. 42 at 4).[8] Brown contends this, in conjunction with the alleged knowledge of Coleman's condition and the failure to follow ADOC monitoring policies, establishes deliberate indifference to Coleman's health. (Doc. 42 at 19). He further alleges Gilbert "instructed . . . Lavine to cover up the death by making a log of the time he checked on [Coleman]." (*Id.* at 4).

However, while a prison guard intentionally denying or delaying medical care can constitute deliberate indifference to support a § 1983 claim, *see Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976), it requires "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment," *Howell*

---

[8] The specific administrative procedures referenced here appear to be Section III(J), and subsection III(J)(2), of the Standard Operating Procedures for Administrative Segregation Unit Cubicle Officers/Rovers, which state, respectively, "Security checks will be conducted every thirty (30) minutes and documented unit security log [sic]" and "30 minutes checks will be performed for responsive, living, and breathing bodies by the Rovers of each Segregation Unit and noted in the segregation log." (Doc. 49-2 at 66).

8

*v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991).[9]  In *Howell*, the plaintiff argued the defendant doctor "should have known that [the decedent] needed close attention, that he should have known that [the decedent]'s condition could deteriorate at any moment," but, despite acknowledging potential malpractice, the Eleventh Circuit held none of the allegations rose beyond negligence to the level of deliberate indifference required by *Estelle*.  *Id. Accord Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989) (holding "[t]he deliberate indifference standard is met only if there were a 'strong likelihood, rather than a mere possibility,' that . . . harm would result").  Brown makes essentially the same allegations here, that Defendants knew of Coleman's hypertensive and diabetic condition and should have known he could deteriorate at any moment.  (Doc. 42 at 2).  However, there are no allegations any of the defendants knew that, that night, Coleman's condition was, or was in imminent danger of, deteriorating.  *Cf. McElligott v. Foley*, 182 F.3d 1248, 1259 (11th Cir. 1999) (distinguishing *Howell* because defendant knew of the deteriorating condition but still did not act).  Although Brown makes general allegations of other inmates being denied their medications, the evidence here supports only the conclusion Coleman was receiving, or at least being offered, the medical care prescribed by the medical team during his time in the segregation unit.  (Doc. 49-3 at 50-55).

      Brown does assert one instance, before Coleman went into segregation, of a "medical episode" during which "[ADOC]'s Guards did absolutely nothing but question [witness Torrianno Carroll] about Mr. Coleman's condition."  (Doc. 42 at 15).  Carroll testified Coleman "got real sick and he started sweating real bad" and Carroll went to the cubical officers and "hollered, hey, man, my cellmate is out, and they were . . . asking [Carroll] a bunch of

---

[9]This opinion was initially vacated pursuant to settlement, *Howell v. Evans*, 931 F.2d 711 (11th Cir. 1991), but subsequently reinstated, *Howell v. Burden*, 12 F.3d 190 n.* (11th Cir. 1994).

questions," such as "[w]hat is he doing, what is going on," but never came to Coleman's aid in the twenty minutes before Coleman felt better. (*Id.* at 15-16). Carroll does not specifically name the guards who were in the cubical at the time. (*See id.* at 16). Although not clearly set out, Brown's argument appears to be that, because an inmate informed some guard or guards of a single incident in which Coleman was briefly sick, all of ADOC should have known Coleman could die at any moment. Brown gives no reason why Gilbert, Lavine, and Lewis[10] should be held individually responsible for information some unspecified guards may have had.

Brown also alleges "[t]he defendants . . . had been notified to monitor by the medical staff contractor (Corizon Inc.)." (Doc. 42 at 4). Brown cites to no specific evidence in the record to support this assertion. Later in the brief, he states the medical records show "Coleman was a 'Chronic Care Patient' and [Corizon] had put the defendants on notice twice regarding Mr. Coleman's treatment and medication needs." (*Id.* at 10).[11] The only medical records in evidence consist of medication administration records, prescription notes, Corizon employees' notes regarding the events surrounding Coleman's death, the medical examination report upon Coleman's entry into segregation, and the log recording medical visits to Coleman in segregation. (Doc. 34-4 at 7-33). They do not appear to show any notification from Corizon to

---

[10] Brown cites to Lewis's deposition testimony in which Lewis is asked if he *knows* of any medical conditions Coleman had and Lewis replied that he did. (Doc. 42 at 18) (citing doc. 49-7 at 4 (16)). However, as the question was asked in the present tense, it only shows he knew at the time of the deposition and is not evidence Lewis knew of Coleman's condition at the time of the incident. Moreover, it could show, at most, that Lewis knew Coleman was diabetic. It is certainly not evidence Lewis knew Coleman's medical condition was in imminent danger of deterioration on the night of February 5, 2012.

[11] Brown supports this assertion by citing to the Bates numbers of three documents in the medical records, (doc. 42 at 10); however, the only medical records in evidence are attached to Dr. Hugh Hood's affidavit, and Bates numbers do not appear on any of those pages, (*see* doc. 34-4 at 7-33). Two of the documents Brown references are described in Corizon supervisor Larry Linton's deposition as documents "to ask security to allow this inmate to come daily to the infirmary for his insulin administration" and "for 10:00 administration." (Doc. 49-3 at 15). It is unclear what the third document is.

any specific ADOC employees of a need to specially monitor Coleman while in segregation. It appears Brown may just be referring to the fact Defendants were put on notice of Coleman's hypertensive and diabetic condition, which indicates neither a doctor's mandate for special monitoring nor a condition so severe that a lay person would know around-the-clock monitoring was a medical necessity. There is no evidence Defendants knew or recklessly disregarded the knowledge Coleman would need emergency medical care in the roughly three hours Lavine and Lewis did not conduct health and safety checks.

Brown also asserts Defendants did not follow ADOC's procedures for monitoring inmates in segregation.[12] (Doc. 42 at 10). However, a violation of state regulations does not definitively establish a violation of constitutional law. *Edwards v. Gilbert*, 867 F.2d 1271, 1277 (11th Cir. 1989). In particular, the *Edwards* court cited with approval a Seventh Circuit case observing "that officers in charge of an intoxicated and violent detainee who committed suicide could not be characterized as deliberately indifferent '[e]ven if the defendants disregarded one or more of their established procedures, such as checking the cells every hour or effectively monitoring . . . ,' because the officers had no knowledge that the detainee was a suicide risk." *Id.* (citing *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983)).[13] These suicide cases are especially persuasive here because Brown makes essentially the same argument as the

---

[12] Brown similarly alleges violations of other regulations (such as the ones against inmates distributing the food trays to the inmates in the segregation units and against guards watching TV on the job, (doc. 42 at 12 & 16-17)), but he does not allege any of these non-specific allegations of prison-regulation violations caused the harm complained of. In fact, the evidence in the record indicates that, on the night of Coleman's death, there was no TV or radio in the cubical and no inmate helped pass out food. (Doc. 49-7 at 3 (11-12)). It is unclear what relevance the alleged violations have to the instant case.

[13] The *Edwards* court further cited a Sixth Circuit case holding, "that violation of state monitoring regulations may have been a contributing cause of death in a suicide case was insufficient to establish deliberate indifference." 867 F.2d at 1277 (citing *Roberts v. City of Troy*, 773 F.2d 720, 723, 725 (6th Cir. 1985)).

11

plaintiffs in those cases (that the defendants should have known of the risk of harm and, in violating their own monitoring regulations, were not available when help was needed). These cases (like *Howell* and *McElligott*) primarily "hinge on the defendant's knowledge, or at least recklessness, that the prisoner's life is in danger." *Duffey v. Bryant*, 950 F. Supp. 1168, 1178 n.15 (M.D. Ga. 1997). If Defendants were not on notice of necessary treatment, they cannot have been deliberately indifferent to providing it.

Brown asserts there was a cover up involving Gilbert and Lavine of the fact Lavine and Lewis had not been performing the health and safety checks in compliance with ADOC policy. (Doc. 42 at 2, 4, & 19). Despite repeatedly asserting a cover up, Brown does not specifically state what element of his claim he is attempting to prove with this evidence, but presumably he is attempting to undermine a qualified-immunity claim asserting Gilbert and Lavine did not know they were violating a constitutional right. However, evidence of a cover up alone, without further contextualizing evidence, only implies Gilbert and Lavine knew they had done something improper. Brown seems to be asking the Court to make the additional inference that what they knew they had done was violate Coleman's constitutional rights. Regardless, even if that inference from an inference is not a step into speculation, it certainly would be a step too far to base another inference on that inference and assume Gilbert and Lavine covered up their actions because they knew they had violated Coleman's constitutional rights by knowing he needed, but not providing, additional monitoring. Brown has not established Gilbert and Lavine knew or should have known of any imminent harm so he cannot establish they were deliberately indifferent to it.

Last, Brown cites only two cases in his response to Defendants' motion for summary judgment. (Doc. 42 at 2-3). The first, *Smith v. Wade*, 461 U.S. 30 (1983), merely holds punitive

damages may be imposed under § 1983 where a defendant is found to have recklessly disregarded the rights of the plaintiff. *Id.* at 56. Brown, however, fails to show Defendants Gilbert, Lavine, and Lewis had any knowledge of an imminent harm to disregard recklessly. The second case, *Wood v. Strickland*, 420 U.S. 308 (1975), Brown cites for the proposition a defendant is not entitled to qualified immunity if he knew or reasonably should have known his action would violate a clearly established constitutional right or he violated the right with malicious intent. (Doc. 42 at 3) (quoting *Wood*, 420 U.S. at 322). However, even if Gilbert, Lavine, and Lewis knew disregarding an immediate medical emergency would violate Coleman's constitutional rights, Brown has not established Defendants knew, or should have known, of an imminent harm to protect against in the first place.

Because Brown has not created a question of fact as to the violation of Coleman's constitutional rights, the motion for summary judgment is **GRANTED** as to Brown's § 1983 claim against Defendants Gilbert, Lavine, and Lewis.

### 4. Warden Price

Beyond the general facts alleged above, Brown specifically alleges Price was in charge of the care, custody and control of Coleman, (doc. 42 at 4), and does not know the regulations she is responsible for enforcing, (*id.* at 5-6). Because Brown does not allege Price was directly involved with the events leading to Coleman's death, he must allege some other causal connection, such as a policy or practice she implemented or approved, between her conduct and a constitutional violation. *See Dean*, 951 F.2d at 1215. Brown asserts that the employees at Donaldson regularly violated several of the prison regulations, (doc. 42 at 5-6, 10, 11-13, & 16-17), and that Price knew of at least one of them, (*id.* at 5). As noted above, however, Brown does not explain how most of the violations of prison regulations were in any way related to

13

Coleman's death, including the violation of the prohibition on prisoners handing out food trays (the violation he alleges Price knew of).

Moreover, allowing her employees to break prison regulations is not a *per se* constitutional violation.  *See Edwards*, 867 F.2d at 1277.  The regulation violation most related to the facts is the segregation rovers failing to perform health and safety checks every thirty minutes, but, even if Price had known about and condoned the practice and it were a factor in Coleman's death, the mere allegation of that violation does not state a constitutional violation under the Eighth Amendment.  *See* Section III.A.3., *supra*.  Price "cannot be liable for unconstitutional acts as supervisor[] where no constitutional violation has occurred." *Harrison v. Oliver*, No. 14-00085-KD-C, 2015 WL 854851, at *13 (S.D. Ala. Feb. 27, 2015) (citing *Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir. 2003) (noting that a supervisor is liable under § 1983 only if he personally participates in unconstitutional conduct or if his actions can be connected causally to a constitutional deprivation.); *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*) (providing that a municipality's § 1983 liability is premised upon an underlying constitutional violation)).

Because Brown has not created a question of fact as to Price's involvement or supervisory responsibility for a constitutional violation, the motion for summary judgment is **GRANTED** as to Brown's § 1983 claim against her.

### B. Count II – Alabama Wrongful Death Act

Count II asserts a state-law claim under the Alabama Wrongful Death Act.  (*Id.* at 7-8). It is unclear whether the underlying theory of liability is premised on deliberate indifference or mere negligence because both are asserted in the complaint and Brown incorporates previous language into later counts.  (*See* doc. 1 at ¶¶ 20-21 & 26).  Furthermore, although Brown's

wrongful death count relies extensively on deliberate indifference language, it also includes some negligence language.  (*Id.* at ¶ 27).  To the extent the second count is based on a deliberate-indifference theory of liability, the claim is **DISMISSED**.

However, Defendants did not specifically address the wrongful death count or the negligence theory in their motion for summary judgment so, to the extent that claim is premised on negligence and not deliberate indifference, it remains pending.  As a result, Brown's sole remaining claim is a state statutory claim for wrongful death premised on a state common-law theory of negligence liability.  In such cases, 28 U.S.C. § 1367(c)(3) allows district courts to "decline to exercise supplemental jurisdiction over a claim . . . if-- . . . the district court has dismissed all claims over which it has original jurisdiction."  With regard to that discretion, the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."  *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004).  *See also United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Mergens v. Dreyfoos,* 166 F.3d 1114, 1119 (11th Cir. 1999) ("[T]his Court has noted that 'if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims.'" (quoting *L.A. Draper & Son v. Wheelabrator–Frye, Inc.,* 735 F.2d 414, 428 (11th Cir. 1984) (citing *Gibbs,* 383 U.S. at 726))).  Because the Court has granted summary judgment on or dismissed the federal claims, the Court finds that **REMAND** to state court of the remaining state law claim is appropriate.

## IV. Conclusion

Based on the foregoing, it is **ORDERED** that Defendants' motion for summary judgment, (doc. 39), is **GRANTED**, and Brown's § 1983 claims are due to be **DISMISSED**. The remaining state-law wrongful death claim based on negligence will be **REMANDED** to the Circuit Court of Jefferson County, Alabama, Bessemer Division.

DONE this 31st day of March 2015.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE